Next case for argument is 22-1664 Chamberlain v. ITC. Good morning. Please proceed. Good morning, Your Honors. May it please the Court. Josh Rosenkranz, representing Chamberlain. Your Honors, I'd like to spend my time today on three issues. Going just a little bit out of order, I'd like to start with the wireless patents, patentability and infringement, and then turn to the 935 patent. Your Honors, the wireless patents are all about using generic RF transceivers to replace signals conventionally sent over hardwires with signals that are wireless, specifically using wireless signals to report the status of or to activate. Okay. Since we've got so little time, let me just get to it. The other side will say, I think, that, yeah, but this is different, and we've got the same claim appearing in different patents, but I'm looking at 718, Claim 18. And they say that the be-all and end-all, and I think the ITC said this, is this last limitation dealing with power consumption. And that's what makes this different, and that's the focus, and this makes it an inventive concept, ordered combination, ya-da-da. So why don't you tell me why this last limitation does not take this out of the simple chamber when one wire versus wireless. Well, so two reasons. First, Your Honor, as to step one, this claim is about wireless capability. It is the focus of the entire specification. It is the focus of just about every element. There's patent consumption, power consumption as well. I'm sorry, did I hear that? There's power consumption and power saving as well. Yes, Your Honor, as to the obstruction detector in one sentence in the specification. But there was nothing inventive at all about replacing the wire that goes to the obstruction detector and communicates about power consumption with a wireless communication. Well, the question is eligibility, though. Does this not take this out of the abstract idea? It doesn't, Your Honor. I'm sorry. It does not, Your Honor. The obstruction detectors that could power down were completely conventional in wired systems. And so all that happened here was to take the wire away from that functionality and make it wireless. And the key point here, Your Honor, is that the ITC had to make up testimony that didn't exist to make that something other than conventional. No one disputes our expert's testimony that low-powered modes were, quote, well-known in obstruction detectors. Are you aware of any cases where we have in the past addressed kind of this power consumption mode with respect to 101? Yes, Your Honor. I think Unilock is a great example. Now, Unilock goes the other way. Why did Unilock go the other way? Because there was something inventive that was done about the power consumption. They figured out a new way to implement power consumption from a computer to peripherals like a mouse so that it would act up more quickly. Nothing in this patent is a new way that is proposed for powering up an obstruction detector. OHD's expert never said it was unconventional in a wired system. He said at page 59334 that it was unconventional in a wireless system. Do you agree that the ITC made a factual finding at Alice Step 2? Do I agree that? The ITC made a factual finding at Alice Step 2. The ITC purported to make a factual finding at Alice Step 2, but it was not supported by substantial evidence because it cited expert testimony that did not say what they say it said. Now what OHD and the ITC are trying to do is to say that this patent invented a new way to control power in an obstruction detector. Well, yeah, it says at 67, I think maybe this is what Judge Cunningham is referring to, at Step 2 it says, well, it talks about the FID saying that are configured, the specific combination of components are configured in an unconventional way to communicate failure, status, and provision. I mean, the problem for you is I'm quite sympathetic, frankly, and understand and appreciate your arguments, but there's a deferential standard to be applied, and is the record here sufficient with the burden being on you to establish this was conventional routine, yada, yada? Agreed, Your Honor. So there was that finding, but neither the ITC nor, most importantly, OHD's expert can simply wave around the term this was an unconventional combination without saying what it was that made it unconventional. And all that the ITC points to is nonexistent testimony that it was Your testimony, I know there's a couple of references in the spec that you point out to this as conventional technology, but what else did you have through an expert or through your citation to the spec to establish that it was not conventional? So 59334, that's Williams, our expert. I'm sorry, Williams is OHD's expert where he makes the point about wireless. Our expert, Hegard, is at 65120. Is that volume three? It is volume three, yes, Your Honor. What was the first site, 59? 59334 is what Williams says, but it's about wireless. And our expert is at 58289 and 65120. I would also add sites that did not make it into the joint appendix, but Hegard, also our expert, which is Respondents Exhibit 2C at pages 36. A lot of this is marked confidential. You can talk about it, Your Honor. It's all about prior art. Okay, we'll check with the other side. Okay, fair enough. So if I may turn with limited time to the infringement point, this is, Your Honor, this is one of the most topsy-turvy infringement cases I've ever encountered. OHD takes patents that are all about wireless communications, and in particular, wireless communication, they say it's so important to the obstruction detector, and it tries to apply it to obstruction detectors that communicate only by wire. Now, to do that, they have to draw a grotesque gerrymander that associates the obstruction detector by the floor with a wireless transceiver on the ceiling. Except that the supposed obstruction detection transceiver that they point to, and you can see this in the briefs at 46 and 47, it plays no role in detecting obstructions. It doesn't communicate with the obstruction detector, and it does not communicate about obstructions. Now, whether you treat this as a question of infringement and substantial evidence or claim construction, there is no dispute about a critical fact that decides this case. The transceiver that OHD describes as the obstruction detector transceiver never communicates with the obstruction detector, and it never communicates with any other component about obstructions. All it communicates about is opening and closing the door. Well, Mr. Rogers, I understood this to be sort of a post-hoc claim construction debate over the use of the word directly versus indirectly. Am I misunderstanding that? I mean, you're saying you're trying to have this claim reconstrued to, I guess, what's your view? Yours is directly or I don't know who's taking what. No, no, your Honor. So this is either a claim construction about the meaning of the term obstruction detector transceiver, and whether that term means that it's got to play some role in detecting obstructions. That's the claim construction point. Or it's a substantial evidence question about can this thing be an obstruction detection transceiver if it's not on the obstruction detector, doesn't communicate with the obstruction detector, and plays no role in signaling or detecting obstructions. Our answer to both, regardless of the way you pose the question, is that we can't possibly infringe. And so going to the exhibit that is the demonstrative on pages 46 and 47, you can see what this gerrymander does. The item that is the obstruction detection transceiver is at the upper left hand of the green box. That's what they're calling the obstruction detection transceiver, and that's up in the ceiling. It does only one thing. It receives a signal from the clicker, which is not even on this diagram. You can draw in the diagram, clicker, transceiver. That communication is open or close the garage door. That's all it does, and you can do this. Do you agree that you would lose on this argument, or what's your position? Just to be clear, we are not saying that it's not okay to point to this transceiver, and this is not just an argument about geography. We're saying that this transceiver does not perform the function that an obstruction detector transceiver has to perform. Because it has nothing to do with detecting or signaling obstructions. If we're wrong about that, no, Your Honor, we have no other argument other than the 101 argument. I see I've cut into my rebuttal time, but I did want to give the court a moment to ask questions. Thank you. Okay, we've got a cast of characters here. So Mr. Bell, under our order, you're up first, and then Mr. Rosen's slide will be after you. Good morning, Your Honor. May it please the court. I'll jump straight to the section 101 issue, as the court did. So there is overwhelming evidence here. We submit one-sided evidence of unconventionality, and as the court has noted, that is, and my friend has conceded, that's subject to substantial evidence review. When you look at what the sites they provided are... Well, can I start you with the claim language? Sure. I mean, so the real end all, I think, is your position that it's this last limitation that saves the claims, and so you don't have to bother with Chamberlain 1, et cetera, et cetera. What does this mean to you? I mean, I read it as changing the power state of the obstruction detector using wireless signals. That's what it says. Yes. And that's eligible because, I mean, the ITC's be-all and end-all, which is this combination of things which is, I know, taken from our case law, but I don't think very many cases have rested on this. Why? How does this take this out? How does it take this out of the abstract idea in Chargepoint and in Chamberlain 1? Sure. So in Chamberlain 1, it was uncontested, I believe, that the only thing you were doing is swapping out wireless, excuse me, wired, and putting in wireless, and the court recognized that's an abstract idea. In contrast here, their abstract idea, and I understand why they tried to form it this way, to align it with that Chamberlain case, they said the abstract idea is, again, just wireless communication. But as the court has noted, you have that additional element that is not in any way accounted for in their proposed abstract idea. So it's eligible because it takes it. So we're changing the state of power. Correct. And that's inventive. In the same way that it was, Your Honor, in Unilock. They had a system, a wireless system, that provided for waking up devices. It facilitated that waking up of a device that was in power save mode, as the court said, to conserve power. And what did it do? It added a single data field to the signal to wake it up, to make it more efficient. And in fact, in that claim, and it's at 957 F3rd 1305-06, the court will note that that claim is remarkably broad in comparison to some other ones. But it's far more specific here, because there they did not even recite that it was for power consumption. The specification explained it, and the court accepted that, and said adding the single data field to the communicated wireless signal was enough. Similarly here, adding a whole new wireless signal that controls the power consumption of this other device, peripheral device, is eligible in precisely the same way at step one. What evidence in the record best demonstrates that power consumption mode is inventive? Do you have something you could point us to? We have our expert testimony on section 101, so I'll start there. And that's at A59-333-35, as my friend helpfully pointed out. And it goes through question after question. And so our expert goes through in great detail, question after question, explaining why, for example, their expert was wrong. This is at questions 179 and 180. Our expert says, as previously discussed, a POSA would not have been motivated to combine the disparate components. And then he points to Dr. Hegart's testimony to the contrary. Question 180 points out that Dr. Hegart doesn't address all the elements or combination. And that again highlights the problem with their argument at both steps, is they don't fully grapple with the notion that this is about power control and improving a system that has an obstruction detection unit and controlling its power for safety reasons, for power consumption reasons. Is that novel? Do they do it in a novel way, controlling the power? Absolutely, Your Honor. There was no anticipation case here. And the non-obviousness case, we won. There's extensive findings on that at A401-437. The ALJ credited our expert over the very expert testimony that they're citing now, which incidentally is from their 103 section, not their 101 section. And we won on that. The commission declined to review that, and they haven't appealed that. So we respectfully submit they're stuck with that. They can't now backfill and have a backdoor non-obviousness argument under the guise of section 101. If you look at what they actually said on section 101, their expert, it is a single paragraph. And if I could point the court to A65-175-76. This is question 189, and I'll pause for a moment. 65-175, and then it carries over onto that next page, 76. And what you'll see is the sum and substance of his testimony is that he found these elements purportedly individually in the prior arc. Doesn't explain how. And he says, completely conclusive with no purported explanation, that the combination is also unconventional. That we submit under any standard of review, let alone substantial evidence standard, can't stand up compared to the evidence. So let's leave the experts to the side for a moment, and let's talk about the specifications. So what's the language in the specification that you would tell us we should look to? So I would point the court to a couple of things. I'm looking at the 718, by the way. I hope you have the same. I am as well. Thank you, Your Honor. So two points on that. First, a site that shows that this isn't about just subbing in wireless. And we know that because at column 1, lines 25 to 27, and this is at A717, it talks about existing systems that had wireless communication. And to Your Honor's question, this is what takes it out of the Chamberlain world, the Chamberlain case, excuse me, that found those claims ineligible, because there, they were just subbing in wireless. So this shows that that's not the case here. And then the second, to Judge Lynn, I believe, pointed this out, there is portion in column 6, and referenced again in column 7, where it explains that one of the advances in this patent is this power control mode. This using signals to change and control the power of the obstruction detection unit. And so that's why we have a claim here. It's claims 18 and 24 in the 718, and claims 17 in the 895. But that seems to be just, I mean, if you're looking at 6, it seems to be this is yet a consequence of moving from wired to wireless. They discuss it as, I mean, what you're saying is right, it just says one advantage, but it talks about by way of radio frequency, wireless signals, hard wiring between the control and obstruction is eliminated. So that seems to be the issue of wire versus wireless versus all of the eggs that are put in the basket by the ITC here, for the very last limitation in this claim. Well, it certainly explains some of the consequences of it, and again, that shows it's in the context of a wireless system. We don't dispute that, and they make much of the fact that there was no dispute that certain transceivers, for example, to have those wireless communications are conventional. That's not the issue here. I know they focus on it in the yellow brief a little bit, and below, that was their main argument. The ITC even said, apart from saying those transceivers are conventional, you're not giving us anything else. On this record, the ITC was certainly well justified when they found the other side's case completely deficient, both in the abstract idea formulation, which, again, they're stuck with, and at the step two analysis, they didn't provide any meaningful evidence at all. Can you tell me, the ITC in its step two analysis mentions a number of times the ordered combination. Can you explain to me what that means in this context? Sure. It references the ordered combination, including at A69, I think, where it credits our expert, who is in turn discrediting their expert. There's a long quote in there saying, Dr. Hagard doesn't take on the ordered combination. I think part of what the ITC's point is, is they haven't met their burden. It's their burden, clear and convincing. They can't come to the ITC. When they say at 68, that they don't address the claim in its entirety as an ordered combination, give me an example of how they were supposed to address the claim in its entirety as an ordered combination. I think they needed to take on specifically, Your Honor, that additional element that we've been talking about, that using a control signal, wirelessly received, to then change the power consumption modes of that obstruction detector. They never take that on. They can't. Let me ask you, was that done, all of the hardware, everything here is really in the prior art, right? There's no new discovery of any, all of this, the transceivers, all of the stuff we're talking about here is in the art. If you cut each piece apart correct, you can find each of those pieces. But as the court noted in Bascom, it's not just about whether the pieces are in the prior art, but whether the combination, that ordered combination. There's no use of these two, where's the claim language? We're looking at the detection unit, we're looking at the, whatever pieces there are, the transceiver, they've never been used in combination in the prior art? Correct. Absolutely. They've never used this whole combination. And the fact that their expert didn't take it on, our expert did take it on, and said that as a whole, these things, I think the quote here is, managing power consumption this way simply did not exist before the asserted claims. That's at question 179. And let alone all of our... Do you agree the claims need a wireless connection to make the power consumption relevant? I'm sorry, Your Honor. Do you agree the claims need a wireless connection to make the power consumption relevant? They receive the signal wirelessly. No question. That is part of all of the asserted claims. So the answer is yes? Yes. Yes. Absolutely, Your Honor. And so looking then to the evidence that our expert also put in on section 103, which again at page 30 of their yellow brief, this is kind of their marquee quote. It's from their expert, but as to section 103. And then they go on to say, and this expert testimony was never refuted. Well, respectfully, I don't know how you can conclude that on this record when we had copious evidence on section 103 that the ALJ credited a 404 crediting question 34, a 405, 416, 415, all down the line resolving this question against them. So in that statement it's telling, though, because they say, we proved. We proved such and such and such. They did no such thing. The ALJ found to the contrary and they haven't appealed any of that 103 decision. So with that backdrop, combined with the stark discrepancy in testimony that the ITC was presented with, single paragraph on one side and 101 paragraphs on the other side explaining why it was unconventional. In fact, certainly justified in finding the claims eligible under those circumstances. And I see I'm getting close on time. I did want to make sure to raise the cross-appeal issues so that it's fairly discussed later in rebuttal. And here, Your Honors, we just raised two discrete claim construction issues. One on the 260 patent and one on the 345 patent. We think in both of these the ALJ got it exactly right, construed the claims correctly. And there's no dispute here before this court that under that construction there isn't infringement. They do infringe under that construction. Everybody agrees. The only question is whether the ITC incorrectly then narrowed the claim scope in a way that was not justified. And as to the 260 patent, for example, all the claim requires is user input to set force limits. User input of force limits. It can be done in any way, including with buttons. And that's shown most clearly at Figure 2. And that's at A704 of the appendix. It shows there a couple of buttons that you use to set the force limit. You can go up or you can go down. And tellingly, that's exactly functionally what Chamberlain's accused products do here. And I would point the court to A51026 where there is an adjustment button that the user presses. And then there are up-down buttons. Now, it's to move the door as well, but specifically the instructions say you use those to set the force limit. And other documents are to the same effect. And their expert admitted, quote, if the user didn't push those buttons, then the force would not be set. That's at A58267-68. So whatever the ITC meant in narrowing the claims, it's unclear whether they are requiring direct input, which they purported to reject, or whether they are requiring an actual numerical input, which they also purported to reject. At a minimum, it includes things like Figure 2, where the user is pressing a button and somehow in the background, it ends up setting the force limit. That's exactly what we have here. And in the 345, we think that the plain meaning of before just means earlier in time. Something happens before something else. Something else happens after something. You're not, as in a directive, saying you must do this before that. You're saying did such and such in fact happen before the other thing. The ALJ recognized that under that construction there is infringement. And unless that court has no further questions. Thank you. May it please the court. Sidney Rosenzweig for the commission. I think an overarching issue here for the issues in Chamberlain's argument today deals with really what they presented to the commission. The feature of a formal adjudication is that you have your hearing in front of, used to be called the hearing examiner, now an ALJ. But then under the APA and under commission rules, you have to identify your errors to the commission. And if we can, what I'd like to do is to just start off with the 101 arguments that were made by Chamberlain to the commission, which appears at page A26479. I think it's in Volume 2 of the appendix. So this is, as you turn to it, 26479. This is their 100-page, 12-point petition for commission review. And you'll see that this 101 argument is issue number 14 that they present. But in... Yeah, so it starts at 478, but it's at the very bottom. 81 is everything that they had to say about Step 1, and then 81 to 82 is everything that they had to say about Step 2. You won't see Mr. Hagard's name here. You won't see any citation to his testimony. You won't see any paraphrasing to his testimony. In connection with Step 1, Chamberlain never presented below, including at the commission, an argument that the power saving was abstract. And if I could understand where some of the court's questioning has been going, it's, well, maybe on a different record, maybe a party could say that, all right, well, there's a combination of abstract things going on here. There's abstraction as to wirelessness, and maybe there's some abstraction as to power savings. And we know that in Chargepoint that happened, that there were two different abstract ideas. There was an abstract idea of wirelessness, and then there was a demand response situation, which was also abstract. Chamberlain never raised that here. And so under Step 1, all that we're left with is this wirelessness. And Mr. Rosenkranz quickly goes to his expert's testimony, which Mr. Bell correctly points out was in connection with obviousness. Well, there's no obviousness case on appeal, and there's no discussion of this testimony in the opportunity where Chamberlain had an opportunity to show the commission and tell the commission why they're correct. So I would just caution the court with Section 101 here to be mindful of what was presented to the commission and be cognizant of the fact that Mr. Rosenkranz is a skilled, famous appellate lawyer, but that some of his arguments don't really match up with what was preserved at the commission. Turning to, and I'll just say that's also for Step 2 of ALICE, because if you look at pages 81 to 82 of this, 26841 to 82, they never talked about, like, the sensors being conventional. And again, there's no discussion of Mr. Hagard's testimony. Instead, it was just discussing transceivers. So their theory of why this patent claim is invalid has shifted or morphed in a way that the commission believes does not comport with exhaustion. I have to unstep to the commission, as I mentioned to one of your friends, 68, 69. They talk about this ordered combination, but I guess I'm a little unclear on what the ordered combination is, because I think the entire focus was on this final limitation. So are they talking about that in connection with the other limitations, or are they talking about just that last limitation? It's not in connection with all the other limitations, that you have a specific arrangement of garage door elements. And it's that ordered combination that this patent claims. The appellants here have said, well, Unilock is a good example, and I think that that's true, because Unilock acknowledged or stated or held that the fact that an invention is compatible with conventional systems does not make it abstract. And I think that's ultimately fatal to their argument here under step two. If they're saying, look, this power savings is not inventive, of course, look at what they told the commission. They didn't really identify much there. And consequently, it shouldn't meet step two. I think understood most properly, their argument is, well, we don't think that this was inventive. We think maybe the prior art might have done this. It wasn't proven below. It hasn't been proven on appeal. There's no 102 and 103, and Unilock stands for a contrary proposition for section 101. Do you contend that in light of the potential actual determination made at step two that we need to give any deference to that finding? Well, I think so. I mean, that's the entire point of deference. We had competing experts. We had Chamberlain filing a petition for review. Chamberlain chose not to rely on its expert testimony at any point in this range of their 100-page document on 101. And from the commission's perspective at the commission stage, this was unrebutted. And even if you were to take into account everything that Mr. Rosenkranz has said, I would still agree with Mr. Bell as to the fact that if you're going to be opining, as to conventionality or non-conventionality between two experts who are butting heads, the ALJ's decision that the overhead door expert was more credible than Chamberlain's. What if we disagree with the expert's statements about what's claimed? Is there any other option for us in terms of a remedy, like will we remand for additional fact-finding? Or what do you think would be the appropriate remedy in that circumstance? Well, I mean, the burden is ultimately on Chamberlain to show invalidity clearly and convincingly. So either it did or it didn't. And I don't believe that on the record here, including what was preserved at the commission stage, there's any basis for remanding for further proceedings, because there hasn't been a showing under Step 1 or Step 2 of clear and convincing evidence to support them. If I can turn to the infringement issue, I mean, this is the same thing again. We're quite far away from what was presented to the commission. I mean, the commission tries to do things in the way that the court expects. We ask the parties for all their claim constructions. And Chamberlain sought claim constructions of a number of terms, including base controller, operatively connected to an obstruction detector, and all of these claim terms, which were resolved in the final ID at pages 323 to 332. I don't know if you need to turn to it, but your clerks have that now. All of these arguments dealt with, like, the physical location and connectedness of different components in the system. So they knew how to make these arguments. And they didn't do it for the obstruction detector transceiver. They never sought a construction for that. They never argued that – and I should say that the theory of infringement was known all along. The claim constructions were resolved here in the final ID, so this isn't like an O2 micro situation where things are coming up late. There's no claim construction issue here because it's been forfeited. And there's no substantial evidence issue here because everyone agrees on how these accused products work. So I think the arguments that Mr. Rosenkranz has might make sense in another proceeding. And we know that the commission's patent findings, whether it's under Section 101 or 102, are not preclusive in any way on any subsequent district court proceedings. So maybe he'll be involved in some trial team then. But it just simply doesn't match up with what was presented and preserved to the commission. Unless the court has any other questions on that, I'll just briefly turn to the cross-appeal and say that the commission really doesn't have much more than what's in our brief. It's the commission's view that it just – even the arguments as to the 345 claim and the patent just don't even pass the smell test. If my wife tells me to take out the trash before I go to work and I don't do it, I'm not going to tell her, well, before I went to work I mean like three weeks from next Wednesday. Before connotes a specific sequence in which things have to happen. And it's the commission's view that the – Yes, our colleagues like Junior example, yeah. We all strive to have household examples of these things. What about the user setting limit? Well, the user isn't setting a limit. The user is just having the automatic system set a limit. And certainly substantial evidence supports the commission's finding that pressing the button to have the system automatically set a limit is not tantamount to a user actually setting a limit, whether it's directly or by up and down arrow buttons. Functionally, the overhead doors theory just reads out the right half of figure 3, appendix page 705 of the patent, that shows that what's contemplated is having separate choices for automatic and some user input and control, and that's just simply not present here. I will note that the appellants haven't gotten into the issue about the commission's modification here. I would just tell, and I'm not going to open up that door with argument unless the court takes me there, but I would just like to note that this particular joint appendix, like things are pretty fragmented, even the table of contents for whatever reason doesn't have dates. But if you were to work your way through Chamberlain's submissions in the commission stage methodically and see what happened blow by blow at the commission with respect to the modification and with respect to all of that, the commission, I think, it helps explain what happened at the commission and why the commission did what it did, which was to clarify its decision at the earliest opportunity, and that that was, that comports with law. Any questions? Thank you. Just a few points. First, on infringement. The ITC is making from this podium a new waiver argument on infringement that they never made before in this appeal. And the reason they never said it before was that we never focused just on the geography of that transceiver. You can see on page 26463 in our petition for review, the ITC and OHD repeatedly said that we were focusing only on geography, and we kept saying, no, that's not what our focus is. Can I take you back to, I appreciate that, but can I take you back to the 101, because I think the point was made that this might have been maybe a very different case, but just the absence of evidence here, either the expert or even attorney argument made below, this is made below, not to us, was just insufficient for your case. Do you have any quick response to that? I do, Your Honor. A couple of points about that. We had ample evidence, both from their expert and from our expert, about the conventionality of communications with obstruction detectors that lowered the power. And I'll give you a few examples which were discussed, or one example in particular, which was discussed by both experts. It's the Fitzgibbon reference. That was a wired system that did exactly the same thing as this wireless system. It's on page 65-144. It is Hegard talking at 65-144 about Fitzgibbon, and OHD's expert also engages about Fitzgibbon. And Fitzgibbon, again, was a wired system that powered up and powered down. And what the ITC points to for conventionality is Williams, and Williams, I'm going to quote to this court what Williams actually said at 59-334. He was not referring to wired communications that did all this. The first word is, quote, that could communicate barrier status information while managing power consumption claimed by the asserted claims simply did not exist before the asserted claims. Was that testimony offered in support of an argument on 101 or 103? This is Williams on 101, I believe. But the commission is right. Our expert, the testimony that we are referring to was obviousness testimony, but there's no reason that you can't use it to do double duty. Yes, Judge Cunningham. What about your response to the commission on the fact that you probably appreciate the compliment on your arguing skills, but that you're pivoting your arguments here before this court versus what you presented to the commission? Can you respond to that? Yes, Your Honor, it was the same argument. I mean, our petition for review, I agree, is sparse, but our arguments before the commission are the same now as they were. And I would add that OHD and the commission are the ones who are pivoting. I mean, we did not, OHD did not invent some new way to control power on the obstruction detector. What they're pointing to now was not what the commission pointed to, which is that there's some magic to doing this differently as in Unilock, that they did power consumption differently. The claims talk about one thing with respect to the obstruction detector. It's send a signal. It wasn't even send a signal. That's one final question because I know your time is running out and I don't want to run out the room. But do you agree that your expert's testimony was on obviousness and not 101? I think you said that. I just wanted to make sure I heard that correctly. The testimony that I was quoting to you earlier, citing to you, was about obviousness. But you can use obvious when he says that this was rampant in the art or well-known in the art was the exact quote. That's transferable to 101. If I may just make two quick last points on 101. As Judge Prost points out, the specification says nothing that suggests that they created a new way to control power. Column six, which everyone was looking at, says it again. It's that same sentence. It says we send a signal, and at some point the signal is sent and the obstruction detector powers down. And then the last thing was the evidence on conventionality, which I've already covered. It's that Williams did not say it was conventional in wired systems. So all you have is wrenching out the wire, putting in wireless, and the thing performs exactly the same, which is not enough to take it out of the abstractness of wired to wireless. Thank you, Your Honors. Thank you, Your Honor. I'll be very brief. The ITC, if I understood my friend correctly, said pressing a button doesn't count to set the force limits. But figure two of that very patent says otherwise. And CG's own documents expressly instruct the user to, quote, set the force. That's at A50184. And do it using a force adjustment mode. That's at that same page. A50184. Also A51054. Also at A51026-28, where there it depicts buttons up and down, that the user is to use precisely to set the force, in addition to moving the door. But these are the instructions that Chamberlain gives on how to set the force. And it involves pressing a button, just like figure two. And finally, on the 345 patent, I understand the Court's concern about before. If I phrase it another way and ask the question, did you clean the table after dinner? That doesn't preclude you from wiping down the table during dinner if you spill some milk or if during, you know, a nice restaurant comes around and cleans the table. The point there is you want to make sure that after you've done the complete dinner, you clean it so you can get on to the next one. Just like here, you want to make sure the full transmissions were done, whatever else happens, before you switch channels so you can do it again on another one. And with that, unless the Court has questions, thank you very much.